IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J. STEPHEN WILEY,<br><br>    Plaintiff,<br><br>    v.<br><br>CENDANT CORPORATION SHORT<br>TERM DISABILITY PLAN, ET AL.,<br><br>    Defendant._____/ | No. C 09-00423 CRB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT** |

This case involves an ERISA disability benefits dispute. In July 2009, the Court granted partial summary judgment, holding that the standard of review was de novo. See Docket No. 36. The parties have each now filed cross-motions for judgment under Federal Rule of Civil Procedure 52 as to whether Plaintiff was unable to perform the material duties of his occupation from August 2004 to August 2006. Because Plaintiff has failed to establish by a preponderance of the evidence that he was totally disabled, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

## BACKGROUND

**A.    Plaintiff's Career at Trendwest/Cendant[1]**

---

[1] Trendwest was a predecessor of Cendant Corp. P Mot. at 3.

Plaintiff J. Stephen Wiley began working for Trendwest/Cendant Corp. in 1991 as a salesman. Ex. 2[2] at AET/WIL 736. His job was to sell timeshares to customers. Id. He was promoted to Assistant Manager, and subsequently to Sales Manager and Project Director, jobs in which he managed an office of other staff selling timeshares. Id. Plaintiff's job required him to recruit new salespeople, motivate and train his sales team, establish and monitor goals for the sales team, monitor sales, and discipline underperforming sales staff. Ex. 13 at AET/WIL 002-3. He described his job as "inherently very stressful," as he was "under tremendous pressure to make a high volume of sales." Ex. 2 at AET/WIL 736. According to O*NET,[3] sales manager positions involve: selling and influencing others through sales presentations and advertising; establishing and maintaining interpersonal relationships; communicating with supervisors, peer and subordinates; and guiding, directing, and motivating subordinates. See http://online.onetcenter.org/link/details/11-2022.00. Plaintiff reported that part of his job was to "make the customers happy and make them feel like they were a part of the family." Ex. 11 at AET/WIL 804.

Plaintiff was diagnosed with diabetes in approximately 1988, but his disease was in control for many years. Ex. 2 at AET/WIL 736. His diabetes became far worse in November 2003, when he began to have crashes due to low blood sugar. Id. At the time, Plaintiff was involved with an FBI and California Department of Real Estate investigation into Trendwest/Cendant, which caused Plaintiff a great deal of stress. Id. at AET/WIL 737.

**B.      Benefit History**

Plaintiff stopped working on February 13, 2004. D Mot. at 2. Six months later, Cendant allegedly terminated his employment. Id. In January 2008, Plaintiff made a claim to Aetna for long term disability benefits based on stress and uncontrolled diabetes. Id. Aetna denied Plaintiff's claim in April 2008 for failure to provide the requested

---

[2] All cited exhibits are attached to the Keenley Declaration.

[3] O*NET refers to the O*NET Resource Center, http://www.onetcenter.org/overview.html, the "nation's primary source of occupational information."

2

documentation. Id. at 6 (citing AET/WIL 684-86). Plaintiff sent additional materials to Aetna, which in May 2008 determined that the information received did not warrant a reversal of its claim decision. Id. at 9 (citing AET/WIL 675). Plaintiff appealed Aetna's decision in September 2008, but submitted no new medical records. Id. (citing AET/WIL 676-71, 811). Aetna then referred Plaintiff's file for clinical review by two doctors. After both found that Plaintiff's documentation failed to support functional impairment, Aetna upheld its denial of it long term disability benefits. AET/WIL 814-15. Aetna informed Plaintiff that it had "determined that there was insufficient medical evidence to support Mr. Wiley's disability, as of February 13, 2004. Therefore, the original decision to deny LTD benefits, effective February 13, 2004, has been upheld." AET/WIL 791-93.

The Administrative Record that was before Aetna consisted of the following.[4]

### C. Plaintiff's Medical Records

#### 1. Plaintiff's Treating Physician: Dr. Ritzo

Dr. Dale Ritzo, an internist, began treating Plaintiff in February 2004 due to work related stress. Ex. 5 at AET/WIL 740. Plaintiff complained about difficulty sleeping and concentrating, noting that he "[f]elt stressed, anxious and depressed" and that his "diabetes became more difficult to control with these issues." Id. Dr. Ritzo recommended that Plaintiff go on disability, and prescribed a sleep aid and antidepressant. Id. He did not record the degree of Plaintiff's blood sugar fluctuations, but noted that Plaintiff's sugars were "becoming more difficult to control." Id.

---

[4] Plaintiff asks the Court to consider two documents not in the administrative record: Ex. 3, a handbook for Trendwest employees that includes information about Plaintiff's job, and Ex. 10, an Attending Physician's Statement completed by Dr. Canio. Defendant objects to both, noting that per Mongeluzo v. Baxter Travenol Long Distance Disability Benefit Plan., 46 F.3d 938, 944 (9th Cir. 1995), "[i]n most cases . . . the district court should only look at the evidence that was before the plan administrator," and that a district court is to exercise its discretion to review evidence outside of the administrative record "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review" (internal citations omitted). Defendant, too, asks the Court to take judicial notice of an employment discrimination complaint filed by Plaintiff against Trendwest/Cendant in 2007, as well as the Special Jury Verdict in that same case. None of the four documents at issue are necessary for the Court to conduct an adequate de novo review, nor would any change the outcome in this matter. Accordingly, the Court will not consider them.

3

Over the next several months, Plaintiff continued to see Dr. Ritzo, and reported "ongoing stress including legal issued related to his work problems," as well as "wide fluctuations in his blood sugar." Id. Plaintiff "began to experience hypoglycemia intermittently," leading Dr. Ritzo to conclude in January 2005 that Plaintiff's diabetes would be difficult to control given Plaintiff's ongoing stress. Id. As Dr. Ritzo attempted to further control Plaintiff's diabetes, Plaintiff experienced increased "hypoglycemic reactions manifested by altered mental status." Id. By June of 2005, Plaintiff reported "still being stressed but [that he] hoped to be able to return to work." Ex. 5 at AET/WIL 741. In December 2005, Dr. Ritzo was still having difficulty controlling Plaintiff's diabetes; he recommended an endocrinology consultation, which Plaintiff initially deferred. Id.

Plaintiff's insurance changed to Kaiser as of March 2006, and so Dr. Ritzo recommended that Plaintiff establish care with Kaiser, and again suggested that he see an endocrinologist. Id. Plaintiff returned to see Dr. Ritzo in December 2006, reporting "continued stress" and "continued anxiety." Id. Dr. Ritzo recommended that Plaintiff follow up with the endocrinologist at Kaiser, and seek a mental health consultation there as well. Id. Plaintiff next saw Dr. Ritzo in June 2007, reporting "occasional symptomatic hypoglycemia." Id. Plaintiff began faxing his glucose count to Dr. Ritzo every few weeks, and they adjusted his insulin accordingly. Id. Plaintiff visited Dr. Ritzo again September 2007, and again in January 2008, when Plaintiff reported that "with the increased stress related to the legal matters pertaining to his disability and work that his glucoses would increase." Id. Plaintiff last saw Dr. Ritzo in June 2008, when he reported having one to two hypoglycemic episodes per week. Ex. 5 at AET/WIL 742. Dr. Ritzo "remained concerned that the additional stresses of work would further exacerbate his diabetic control, further exposing him to the risks of diabetes." Id.

In July 2008, Dr. Ritzo summarized his opinion on Plaintiff's health in the following manner. He noted that Plaintiff's "hypoglycemia has resulted in disorientation in the past." Id. He explained that stress exacerbates diabetes, because it creates hormones that oppose the effects of insulin. Id. Accordingly, he stated that "at this time and for the immediate

4

future, I feel it would be in [Plaintiff's] best interest to not have the additional stresses that employment would cause." Id. He opined that Plaintiff was at risk of "cardiovascular, renal, neurological, and ophthalmologic complications" and that work related stress would exacerbate those risks. Id. He concluded that while "a different reviewer might come to different conclusions than I have," he believed that Plaintiff "should be considered disabled from work due to his medical condition." Id.

Dr. Ritzo was subsequently contacted by Wendy Weinstein, a reviewing physician for Aetna (discussed at greater length below). Ex. 14 at AET/WIL 787. In their November 2008 conversation, Dr. Ritzo told Weinstein that Plaintiff "does not have neuropathy or retinopathy and there has been no documentation of microalbumin." Id. In addition, Dr. Ritzo communicated that "there does not appear to be documentation of end organ damage at ths time," nor "a history of visits to the emergency room or the need of hospitalizations." Id. He further noted that "there may have been some calls to the paramedics where [Plaintiff] complained of hypoglycemic episodes, but he thought [Plaintiff] was treated at the site where the paramedics evaluated him and he never required transfer to the hospital." Id. He told Dr. Weinstein that Plaintiff's diabetes was "difficult to control," that "stress and situational anxiety has played a component in [Plaintiff's] difficulty controlling his diabetes," and that he was concerned that Plaintiff's return to a stressful environment would impact the control of his diabetes. Id.

2. Plaintiff's Treating Psychologist: Dr. Reno

Dr. Dennis Reno, Ph.D. was Plaintiff's treating psychologist beginning in November 2003. Ex. 9 at AET/WIL at 646. Dr. Reno sent three nearly identical letters– one in March 2005, and two in July 2005– regarding Plaintiff's qualification for disability benefits. See Ex. 9 at AET/WIL 646-51. In those letters, Dr. Reno explained that Plaintiff began treatment due to anxiety and insomnia, apparently in connection with the investigation of his employer. Ex. 9 at AET/WIL 646. He stated that Plaintiff's physician prescribed him anti-depressant and sleep medication in February 2004, and was put on temporary disability for his volatile blood sugar readings. Id. Dr. Reno described Plaintiff's state in March 2004 as "depressed

with suicidal ideation," and noted, too, that when Plaintiff was terminated in September 2004 he thought about killing himself. Id. Dr. Reno reported, however, that at the time of his letters, though Plaintiff was experiencing restless sleep and stress tied to his legal action against Cendant, Plaintiff's judgment was intact. Ex. 9 at AET/WIL 647. He noted that Plaintiff could "clearly demarcate his increase in blood sugar due to stress." Id. In his two July 2005 letters, he added that Plaintiff's "[u]nstable diabetic condition causes [a] breakdown in [Plaintiff's] physical and mental functioning and adds to his being depressed." Ex. 9 at AET/WIL 649. Dr. Reno concluded in all three letters: "Mr. Wiley will likely recover from the stress of his legal battles. He is capable of working and is not permanently disabled due to a psychological condition." Ex. 9 at AET/WIL 647, 649, 651.

3. Plaintiff's Treating Endocrinologist: Dr. Canio

Dr. Timoteo Canio, an endocrinologist at Kaiser, began treating Plaintiff in February 2006. Ex. 6 at AET/WIL 746. That same month, he found that Plaintiff's diabetes was in "poor control" and discussed "carb counting" and glucose testing with Plaintiff. Ex. 6 at AET/WIL 747. In June 2006, Dr. Canio found that Plaintiff's diabetes was "stable"– he noted that Plaintiff was taking medication and "report[ed] improvement" of his daily blood sugar; he recommended that Plaintiff continue with carb counting and attending a diabetes class. Ex. 6 at AET/WIL 748. In September 2006, Dr. Canio noted that Plaintiff was "under tremendous stress from an ongoing litigation," and had reported to him that his diabetes was "difficult to control" and that he felt "his stress and anxiety contribute to the inability to control" it. Ex. 6 at AET/WIL 749. In December 2006, Dr. Canio stated that Plaintiff "reports occasional highs and lows depending on stress," and that "he is under tremendous stress at this time because of litigation." Ex. 6 at AET/WIL 750. He added that he and Plaintiff had had a lengthy discussion of diabetes, during which Dr. Canio "explained that he has no complications that should limit him from work." Id. Dr. Canio did not fill out Plaintiff's disability forms as Plaintiff requested. Id.

Plaintiff's treatment with Dr. Canio continued into 2007. In February of that month, Dr. Canio reported that Plaintiff's thoughts were fleeting and that he referred to ongoing

stress from the investigation of his employer. Ex. 6 at AED/WIL 752. He added: "When asked specifically about his disease, he tells me that he has difficulty controlling his blood sugar levels because of the stress. He reports several episodes of low blood sugars and feeling lost at times." Id. Dr. Canio noted that in his opinion, Plaintiff's lack of control over his diabetes was "directly related to his stress and anxiety." Id, Dr. Canio saw Plaintiff again in June 2007, noting that Plaintiff was "[r]eluctant to make changes," and acknowledged being "inconsistent with measuring his food." Ex. 6 at AET/WIL 754. A week later, Plaintiff returned to Dr. Canio's office with his wife and son to discuss "his ongoing difficulty with low blood sugars and his inability to work as a result." Ex. 6 at AET/WIL 755. Dr. Canio told Plaintiff that he had received a form from his disability insurer inquiring as to Plaintiff's "limitations and restrictions," and that "I felt that he did not have either of these with regards to his diabetes." Id. Plaintiff and his family protested that Plaintiff had "spells" where he is disoriented, does not know who he is, and requires monitoring, that such spells occur nine times a week and are attributable to low blood sugar. Id. Dr. Canio responded that "this may be related to stress rather than his diabetes." Id. He told Plaintiff that he reviewed Plaintiff's blood sugar log and that while he saw several lows, most of the out-of-control numbers were in the high 100's, mid-200's and even over 300. Id. He explained: "what is asked of me is my opinion regarding his ability to work. . . . given the objective data we collect, I see no limitations nor restrictions for him to work," reiterating: "I have no objective data to suggest that he cannot work." Ex. 6 at AET/WIL 756.[5]

          4.         Social Security Decision

---

[5] Plaintiff asks the Court to take judicial notice of an Attending Physician's Statement completed by Dr. Canio in March 2007 for MetLife insurance. See Ex. 10. On that form, Dr. Canio checked "no" next to the question, "Has patient been released to work in his/her occupation?" Id. Dr. Canio noted "1 episode of hypoglycemia" since the last report– though it is unclear when that was – and wrote in the "Additional Remarks" section: "The patient has no complications of diabetes except for episodes of hypo-[glycemia]. Patient's diabetes is adversely affected by anxiety and depression." Id. For the reasons already articulated, the Court will not take judicial notice of this document. In addition, the meaning of this form is not sufficiently clear to be helpful. It is unclear whether Dr. Canio's checking "no" refers to a decision that he made not to clear Plaintiff to work, or his recognition of another doctor (perhaps Dr. Ritzo)'s decision. Given his December 2006 and June 2007 treatment notes, it is difficult to interpret this Attending Physician's Statement to be an opinion by Dr. Canio that Plaintiff was totally disabled and not fit to work in his occupation.

7

In 2007, an administrative law judge with the Social Security Administration ("SSA") found that Plaintiff was "disabled beginning February 12, 2004 because of insulin-dependent diabetes mellitus, depression, and anxiety so severe [he was] unable to perform any work existing in significant numbers in the national economy." Ex. 4 at AET/WIL 768. The SSA held that Plaintiff was "markedly impaired in [his] activities of daily living," had "marked difficulty maintaining social functioning," and had "marked difficulties maintaining concentration, persistence, or pace." Id. It further held that he had "poorly controlled insulin-dependent diabetes mellitus, which causes disorientation, fatigue, and an inability to concentrate," as well as "severe depression, anxiety and panic attacks." Id.

### 5. Other Insurer's Physician

Included among Dr. Ritzo's medical records was a September 2007 letter to Dr. Ritzo from Dr. Judy Cohen, a doctor with UNUM, Plaintiff's insurer under a different plan. AET/WIL 148-50. Dr. Cohen described her review of Plaintiff's medical documentation, and concluded that "the records provide no medical indication that the insured would not have been able to continue to work within his diabetes as he had worked with it in the past." AET/WIL 149. She explained that often it is not diabetes, but end organ damage caused by diabetes that is limiting, and that Plaintiff had no end organ damage. Id. She concluded that she agreed with Dr. Canio, who said in June 2007 that he saw "no limitations with regard to doing his customary work." AET/WIL 150.

Dr. Ritzo responded to Dr. Cohen's letter, writing, "I agree with your summary; my concern is that the stresses of work will further exacerbate very difficult to control diabetes and put him at greater risk of . . . end organ failure." Id. He added: "This is just my opinion– I cannot predict future events and have no objective way of measuring this." Id.

### 6. Aetna's Reviewing Physicians

#### a. Dr. Mendelssohn

Dr. Elena Mendelssohn is a psychologist who was hired by Aetna to review Plaintiff's claims. The materials she reviewed included Plaintiff's letter of appeal, job description, the favorable SSA decision, declarations from Plaintiff and his wife, and documentation from

8

Drs. Reno, Canio, and Ritzo. Ex. 12 at AET/WIL 776-77. Dr. Mendelssohn sought to determine "whether medical support[ed] a functional impairment from [Plaintiff's] own occupation from 1/13/04-8/12/06. . . ." Ex. 12 at AET/WIL 777. She noted that she would "defer to the appropriate medical specialists to determine the impact of" Plaintiff's diabetes on his functionality; her assessment was limited to Plaintiff's psychological issues. Id.

Dr. Mendelssohn noted that while Dr. Ritzo had "consistently opined that [Plaintiff] was unable to return to work," he did not indicate how Plaintiff's psychological problems impacted his functionality. Id. She commented that while Dr. Ritzo had found that Plaintiff was unable to engage in work, his letters did "not include examination findings, behavioral observations, or specific signs and symptoms of an emotional disturbance." Id. Dr. Mendelssohn observed that Dr. Canio had found Plaintiff's anxiety and depression to be a contributing factor to his diabetes and "the main challenge" for Plaintiff. Ex. 12 at AET/WIL 778. Dr. Mendelssohn stated that while Plaintiff was apparently not seen by a psychiatrist, he saw Dr. Reno, a psychologist, as of January 2004. Id. She recounted Plaintiff's various meetings with Dr. Reno, and that while he had been diagnosed with major depression, his reported affect in July 2004 was normal, and his status in December 2004 was stable; "[a]lthough there was report of lability, Dr. Reno did not include a specific description of emotional dyscontrol or inappropriate emotionality." Id.

Dr. Mendelssohn concluded that though there were sporadic reports of "agitation, distractability, suicidal ideation, and lability," the documents submitted did not describe emotional dyscontrol or inappropriate tearfulness/emotionality," nor documentation of a plan of self-harm, nor a recommendation for more intensive care due to the threat of self-harm. Ex. 12 at AET/WIL 780. She found, too, that while there were reports of anxiety, "the documents did not indicate a description of specific anxious behaviors to ascertain the impact of [Plaintiff's] reported anxiety on his functioning." Id. And though there were reports of distractability, "the submitted documentation did not include measurements of [Plaintiff's] cognitive functioning to substantiate the presence of cognitive impairment." Id. Moreover, Dr. Mendelssohn added, Plaintiff's own treating psychologist had found him capable of

working. Id. This, while "the documentation indicates that the claimant was experiencing some degree of emotional distress which likely required psychotherapy and psychopharmacology," Dr. Mendelssohn opined that Plaintiff was not functionally impaired as of February 2004. Id.

### b. Dr. Weinstein

Dr. Wendy Weinstein is a medical doctor, board-certified in internal medicine, who was also hired by Aetna to review Plaintiff's claims. The materials she reviewed included Plaintiff's letter of appeal, job description, the favorable SSA decision, declarations from Plaintiff and his wife, and documentation from Drs. Reno, Canio, and Ritzo. Ex. 14 at AET/WIL 783-84. She noted that Plaintiff initially left work due to anxiety and depression, and that he also had a "history of diabetes with some fluctuating blood sugars" and stress that reportedly exacerbated his diabetes. Ex. 14 at AET/WIL 784.

Dr. Weinstein then went through the medical records. She noted that Dr. Ritzo saw Plaintiff for "routine follow-up of his diabetes," and that while Dr. Ritzo referenced uncontrolled diabetes and ongoing anxiety, "there is no documentation of physical examination abnormalities," nor of "complications from the claimant's diabetes or specific functional impairments." Ex. 14 at AET/WIL 785. She reiterated that records in 2006 and 2007 continued to discuss Plaintiff's anxiety, depression, and diabetes, but did "not document abnormal physical examination findings or specific complications from [Plaintiff's] diabetes in the presented medical records." Id.

Dr. Weinstein noted that Plaintiff had submitted self-reported blood sugar data from 2004 to 2008, and recognized that there was "some fluctuation in the blood sugars and reference to periodic low blood sugar," although "no documentation of the need for urgent care with the low blood sugars or hospitalization." Ex. 14 at AET/WIL 786. Dr. Weinstein also quoted Dr. Canio's finding that no objective data suggested that Plaintiff could not work. Id. And she described her November 2008 conversation with Dr. Ritzo, discussed above. Ex. 14 at AET/WIL 787.

Based on her review, Dr. Weinstein concluded that while Plaintiff "referenced episodes of low blood sugars by self-report" with "episodes of confusion," "there is no documentation of true hypoglycemic episodes with associated examination abnormalities." Id. She echoed Dr. Canio's finding that Plaintiff had "no limitations nor restrictions" from work, and distinguished Dr. Ritzo's findings as not documented by "actual physical examination abnormalities or specific complications from the claimant's fluctuating blood sugars that would cause work restrictions and limitations." Ex. 14 at AET/WIL 788. She added that although Plaintiff had "one or two episodes of reported hypoglycemia . . . evaluated by the paramedics, there has been no documentation of permanently abnormal physical examination findings or documented hypoglycemic episodes associated with the need for emergency room evaluation and hospitalization." Id. Dr. Weinstein found that the few substantiated hypoglycemic episodes did not "substantiate persistent functional impairment from sedentary work." Id.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the court does not determine whether there is an issue of material fact, but whether the plaintiff is disabled under the policy. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). The Court is to "evaluate the persuasiveness of conflicting testimony," and make findings of fact. Id. This is considered a "bench trial on the record," which may "consist[] of no more than the trial judge rereading [the administrative record]." Id.

Plaintiff carries the burden of showing that he was disabled under the terms of the Plan during the claim period. See Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003). The standard Plaintiff must meet is preponderance of the evidence. See Finley v. Hartford Life & Acc. Ins. Co., No. 06-6247, 2007 WL 4374417,

11

at *7 (N.D. Cal, Dec. 14, 2007). During the first 24 months of benefits eligibility under the Aetna plan at issue, "Total Disability" is defined as the participant's inability "solely because of injury or disease, to perform the material duties of [his] own occupation." Ex. 1 at AET/WIL 690.[6] Plaintiff became eligible for benefits under the Aetna plan in August 2004. P Mot. at 2, n.4.

The Court has already ruled that de novo review applies to Plaintiff's claim for benefits under the Plan. Docket No. 36. Under a de novo standard of review, no deference is owed to the plan administrator; courts are instead to "decide for themselves what a term of the [Plan] means instead of deciding whether the plan administrator was reasonable in how it construed the term." See Kearney, 175 F.3d at 1088.

## DISCUSSION

The most difficult obstacle Plaintiff faces in meeting the preponderance of the evidence test is that, even setting aside the opinions of the two Aetna-hired doctors, two of Plaintiff's own treating physicians found that Plaintiff was capable of working. Only Dr. Ritzo concluded that Plaintiff could not work due to his illness.

But Dr. Ritzo apparently recommended that Plaintiff go on disability almost immediately once he began seeing Plaintiff in February 2004; the decision was based on Plaintiff's feelings of stress, anxiety, and depression, and his diabetes having become "more difficult to control." See Ex. 5 at AET/WIL 740. This step, apparently taken in advance of any reported hypoglycemic episodes,[7] was arguably overcautious. Plaintiff's health does seem to have deteriorated after that point, as Plaintiff reported "hypoglycemic reactions manifested by altered mental status" in 2005. Id. However, it does not appear that Dr. Ritzo

---

[6] Following the first 24 months, total disability is defined as the participant's inability "solely because of injury or disease, to work at any reasonable occupation." Id. Only the first 24 months of eligibility are presently at issue; Plaintiff asks that the Court remand the question of his eligibility for benefits after August 2006 to the Plan. P Mot. at 9 n. 8.

[7] Plaintiff's declaration asserts that he started to have crashes in November 2003, and that he had crashes several times a week by early 2004. Ex. 2 at AET/WIL 736-37. He also describes a crash "not long before [he] went out on disability" in February 2004, in which he drove 20-30 blocks and "had no idea what [he] was doing." Ex. 2 at AET/WIL 737. The earliest report of hypoglycemia from Dr. Ritzo is post-December 2004, and describes such episodes as intermittent. See Ex. 5 at AET/WIL 740 ("he also began to experience hypoglycemia intermittently").

12

had much documentation of the hypoglycemic episodes during the claim period other than Plaintiff's self-reports. This is not to say that Plaintiff did not have hypoglycemic episodes, only that their severity, frequency, and impact on him and his work were not objectively measured.

Moreover, while Dr. Ritzo by no means retreated from his opinion that Plaintiff was disabled and incapable of working, neither did he express that view with absolute certainty. He acknowledged that a different reviewer might come to different conclusions than he did. Ex. 5 at AET/WIL 742. He also wrote to Dr. Cohen that he agreed with her summary of Plaintiff's medical history in which she concluded that Plaintiff had "no limitations with regard to doing his customary work," but was concerned that work-related stress would put Plaintiff at greater risk; he further acknowledged that he had "no objective way of measuring this." AET/WIL 150.

While Dr. Ritzo is certainly credible, he appears to have recommended disability early on, based largely on Plaintiff's self-reports, and in the absence of very much objective data.

Plaintiff's other two treating physicians do not help his case. This is particularly problematic as they are the two specialists he saw, and would presumably have the greatest understanding of his diabetes and mental health issues, respectively. While Dr. Canio found that Plaintiff's diabetes was in poor control, he also noted that Plaintiff's diabetes was "stable" and had improved at times during the claim period. Ex. 6 at AET/WIL 748. In December 2006, just after the claim period, Dr. Canio expressed to Plaintiff his view that Plaintiff had "no complications that should limit him from work." Ex. 6 at AET/WIL 750. Plaintiff apparently did not raise the issue of low blood sugar episodes with Dr. Canio until 2007. Ex. 6 at AET/WIL 752; see also Ex. 6 at AET/WIL 750 (in December 2006 Plaintiff simply reported "occasional highs and lows"). Similarly, while Dr. Reno described Plaintiff's anxiety, stress, and depression with suicidal ideation during the claim period, as well as the interplay between his diabetes and mental health issues, he did not find Plaintiff disabled. He explicitly found that "Plaintiff is capable of working." Ex. 9 at AET/WIL 647, 649, 651.

If Plaintiff's diabetes was so serious that he could not work, one might have expected to see more information as to the frequency of his hypoglycemic crashes, objective evidence of the complications he suffered from diabetes, as well as incidents of hospitalization or other urgent care.[8] If his mental health was so serious that he could not work, one might have expected to see references to more significant psychological (or even psychiatric) treatment, hospitalization, or some efforts to measure his impaired cognitive functioning. One would also have expected the two specialists Plaintiff saw to have concluded that Plaintiff could not work.

Plaintiff clearly suffered from difficult to control diabetes, anxiety and depression during the claim period– something even Aetna does not dispute. See D Opp. at 2. However, the record does not support a finding that these illnesses, independently or together, see Lawrence v. Motorola, Inc., No. 04-1553, 2006 WL 2460921, at *8 (D. Ariz. Aug. 24, 2006) (plan administrator to consider combination of impairments), were so severe as to render him unable to perform the material duties of his job. Compare Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) (overruled on other grounds) ("[t]hat a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working."). No doubt Plaintiff's job was stressful, even in the absence of an investigation into his employer's practices, and that stress made his diabetes worse. No doubt Plaintiff's job required him to communicate persuasively with both customers and sales staff, and that coping with his diabetes and mental health issues detracted from his ability to do so effectively. But it is not clear that Plaintiff's sporadic episodes of low blood sugar or his anxiety and depression prevented him from doing his job on a daily basis.

Plaintiff's arguments to the contrary are ultimately unpersuasive.

---

[8] The one incident involving the paramedics that is mentioned in Plaintiff's declaration took place outside of the claim period. See Ex. 2 at AET/WIL 737. His wife's declaration mentions having to call the paramedics "at least once" in late 2003. Ex. 8 at AET/WIL 762.

Plaintiff argues that Dr. Mendelssohn improperly required Plaintiff to exhibit "emotional dyscontrol or inappropriate tearfulness," which was not a requirement of the Plan. P Mot. at 16. An ERISA Plan Administrator cannot rewrite the Plan. See Saffle v. Sierra Pacific Power Co. Bargaining Unit, 85 F.3d 455, 459-60 (9th Cir. 1996). But Dr. Mendelssohn was not rewriting the Plan.[9] Her full statement was that there were reports of "agitation, distractability, suicidal ideation, and lability; yet the documents submitted did not include description of emotional dyscontrol or inappropriate tearfulness/emotionality." Ex. 12 at AET/WIL 780; see also Ex. 12 at AET/WIL 778 ("Although there was report of lability, Dr. Reno did not include a specific description of emotional dyscontrol or inappropriate emotionality"). It is reasonable that Dr. Mendelssohn would seek not only reports of generalized emotional states but examples of how those states manifested themselves on a daily basis; otherwise, it is impossible to assess how they impacted Plaintiff's work.[10]

Similarly, Plaintiff argues that Dr. Weinstein rewrote the Plan by noting the lack of "documentation of physical examination abnormalities, end organ damage, or uncontrolled diabetes requiring urgent care, emergency room visits, or hospitalizations." Ex. 14 at AET/WIL 787; D Mot at 18. Again, it is not rewriting the Plan to seek additional details as to how the diabetes manifested itself, as evidence of whether and how it caused a functional impairment in Plaintiff's work. For example, end organ damage, though not required by the Plan, would be relevant; Dr. Cohen explained that "it is not the diabetes that would be limiting but rather the end organ damage as a result of the diabetes which is often limiting." AET/WIL 149. In addition, that Dr. Weinstein characterized Plaintiff's hypoglycemic crashes as "few" and "isolated," Ex. 14 at AET/WIL 788, while Plaintiff characterizes them as more frequent, Ex. 2 at AET/WIL 737, again shows not a rewriting of the Plan but a

---

[9] Nor is it rewriting the Plan that Dr. Reno characterized Plaintiff as not "permanently disabled"– Dr. Reno's relevant conclusion was that Plaintiff "is capable of working." See Ex. 9 at AET/WIL 647, 649, 651.

[10] Plaintiff's complaint that Dr. Mendelssohn "expressly declined to consider any of the medical evidence pertaining to [Plaintiff's] poorly-controlled diabetes," P Mot. at 16, is unavailing; Dr. Mendelssohn is a psychologist and properly left the analysis of Plaintiff's diabetes to others.

15

paucity of objective information as to the crashes, and their impact on Plaintiff. It is not improper for a Plan to consider a lack of objective evidence. See Safavi v. SBC Disability Income Plan, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007) ("While the lack of objective evidence played an important part in the decision, the record does not demonstrate that Defendant improperly demanded objective evidence without informing Plaintiff or that it altered the requirements of the Plan"); see also Kushner v. Lehigh Cement Co., 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008).

Plaintiff also complains that Drs. Mendelssohn and Weinstein did not focus on Plaintiff's actual job duties. P Mot at 16, 18. As an initial matter, both stated that they had reviewed Plaintiff's job description. Ex. 12 at AET/WIL 776-77; Ex. 14 at AET/WIL 783-84. Their having found that Plaintiff had no limitations from working logically means that they found that he had no limitations from working in his own job. In addition, though Plaintiff relies heavily on Dr. Ritzo's finding that Plaintiff is disabled, Dr. Ritzo did not detail the specific requirements of Plaintiff's job, either– referring only to "stress including legal issues related to [Plaintiff's] work problems." See Ex. 5 at AET/WIL 740.

Plaintiff further argues that Aetna did not give sufficient weight to the SSA opinion finding Plaintiff disabled not only as to his own occupation, but as to "any work existing in significant numbers in the national economy." P Mot at 18 (citing Ex. 4 at AET/WIL 768). Though he acknowledges that Aetna was not required to follow the SSA's determination, see Madden v. ITT Long Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1285 (9th Cir. 1990), Plaintiff argues that the determination is relevant on de novo review. P Mot. at 14. The Court agrees that the SSA determination is relevant; it simply disagrees with the SSA's conclusion. The SSA makes its benefits determinations under different standards, and the Court does not have before it all of the evidence presented to the SSA. Madden, 914 F.2d at 1286. Moreover, Aetna's reviewing doctors did consider the SSA opinion, Ex. 12 at AET/WIL 776-77; Ex. 14 at AET/WIL 783-84; they just, like the Court, reached different conclusions.

**CONCLUSION**

For the foregoing reasons, Plaintiff has not met his burden by a preponderance of the evidence. Plaintiff's medical condition– his combined diabetes, anxiety and depression– did not prevent him from performing the material duties of his job as a sales manager. Accordingly, he is not totally disabled under the Plan for the claims period of August 2004 to August 2006. The Court therefore GRANTS Defendant's motion and DENIES Plaintiff's motion. The Court remands the question of Plaintiff's eligibility for benefits post-August 2006 to the Plan.

**IT IS SO ORDERED.**



Dated: January 19, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE